## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

FIORE INDUSTRIES, INC.,
a New Mexico Corporation,

       Plaintiff,

    v.                                        Civ. No. 18-1218 SCY/JFR

John ERICSSON, an individual,
and ALGASTAR, INC., a Delaware
Corporation,

       Defendants.

### SEALED[1] MEMORANDUM OPINION AND ORDER
### DENYING MOTION FOR DEFAULT JUDGMENT
### AND GRANTING MOTION TO ENFORCE THE SETTLEMENT

Plaintiff Fiore Industries, Inc. filed the present Sealed Motion For Default Judgment Or

In The Alternative To Enforce Settlement And For Sanctions. Doc. 113. In the motion, Plaintiff

argues that the "bad faith" actions of Defendants John Ericsson and Algastar, Inc. merit default

judgment. Alternatively, Plaintiff states that the parties reached a binding settlement agreement

on May 26, 2021 and requests a Court order enforcing that settlement. The Court finds that the

parties reached a binding settlement agreement; accordingly, the Court will enforce the material

terms of that settlement. In light of this finding, the Court denies the request for default

judgment.

---

[1] This Memorandum Opinion and Order is being filed under Seal because confidentiality was a term of the settlement agreement. However, the Court finds it is in the public's interest to file an unsealed, redacted version of this Memorandum Opinion and Order on the docket. Therefore, the parties must contact the Court within 14 days to advise the Court of any terms in this Memorandum Opinion and Order that they wish to be redacted from the public view. If the Court does not hear from the parties, it will unseal this Memorandum Opinion and Order in its entirety.

## BACKGROUND

The settlement negotiation history in this case is extensive. The Court's involvement with this process began when Magistrate Judge John Robbenhaar held a five-hour settlement conference on March 30, 2020. Doc. 56. The case not having settled, Judge Robbenhaar held another five-hour settlement conference on May 26, 2021. This time, the case settled. Doc. 90 (clerk's minutes). Bill Miera, Christine Zack, and counsel Benjamin Thomas all attended the May 26 settlement conference for Plaintiff Fiore. *Id.* For Defendants, John Ericsson, Jane Barnes, and counsel Ian Bezpalko attended. *Id.* Judge Robbenhaar put the settlement on the record. Doc. 135 (transcript). He stated that the terms of the settlement involved confidentiality, a nondisparagement agreement, a release of all claims by all parties against all other parties, and no admission of liability by any party. *Id.* at 2.

To ensure the agreement was entered into voluntarily, he asked both parties a series of questions:

> THE COURT: I'll start with Mr. Miera. Sir, you have participated with me on Zoom, but certainly we've interacted for the last several hours. You don't appear to be under the influence of any drugs, alcohol, or medication that might impair your judgment or your ability to understand these proceedings. Is that correct of me to assume or to conclude that you are not under the influence of any intoxicant?
>
> MR. MIERA: That is correct.
>
> THE COURT: All right. And have you entered into this settlement agreement voluntarily and willingly?
>
> MR. MIERA: Yes, I have.
>
> THE COURT: All right, Mr. Ericsson, same question for you, sir. I have worked with you also now for the last four-plus hours. We've engaged back and forth. And you don't appear to be under the influence of any drugs, medication, or alcohol, at least certainly nothing that could impact your ability to understand these proceedings. Is that a true statement?
>
> MR. ERICSSON: That's a true statement.

THE COURT: All right. And sir, have you entered into this settlement agreement willingly and voluntarily?

MR. ERICSSON: Yes.

*Id.* at 3.

Judge Robbenhaar ordered the parties to submit closing documents within 30 days, including the language of the release, the stipulated judgment the parties had discussed, and "any other documents that are required." *Id.* at 4. He did not at any point state that the agreement was tentative or subject to further negotiation. *See generally id.* Both parties were represented by counsel. *Id.* at 2.

Judge Robbenhaar summed up his understanding of the material terms of the settlement agreement as follows:

> The general terms of the settlement agreement in this case involved Defendant Algastar, Inc. ("Algastar") paying Plaintiff a specified sum of money upon execution of a written settlement agreement[2], with a promissory note for Defendants to pay the full balance of the settlement amount to Plaintiff with a balloon payment in two years. However, if Algastar paid a specified portion of that total settlement amount due to Plaintiff within the first two years following the written settlement agreement, then Algastar would receive an additional two years to make its final payment to Plaintiff. Algastar's promissory note to Plaintiff was secured by a patent on the BioStem technology pursuant to terms agreed upon by the parties. Defendant Ericsson also agreed to execute a personal guaranty of that promissory note. The parties agreed that the settlement would be reduced to a stipulated judgment to be held in escrow pending any breach of the agreement; Plaintiff Fiore agreed to make any payments associated with the escrow account.

Doc. 98 at 3 (footnote omitted).

But that was not the end of the story. On June 29, Plaintiff filed its first Motion To Enforce Settlement And For Sanctions And Attorney Fees. Doc. 91. According to Plaintiff, Mr.

---

[2] Although Judge Robbenhaar did not publicly specify the amounts Defendants agreed to pay as part of this confidential settlement, those amounts have never been in dispute.

Bezpalko (Defendants' attorney) raised concerns with some bankruptcy-related language in the settlement agreement. *Id.* at 2. Therefore, Mr. Thomas (Plaintiff's attorney) provided a new version with different bankruptcy language. By this point, however, Mr. Ericsson had consulted with a bankruptcy attorney who advised him not to sign a personal guarantee. *Id.* Mr. Bezpalko explained that, at the time of the May 26 settlement agreement, Mr. Ericsson thought a personal guarantee merely required him to make sure that Algastar used its best efforts to pay the settlement. This prompted Mr. Bezpalko to ask that "best efforts" language replace the personal guarantee language in the settlement agreement. *Id.* Plaintiff rejected this request and filed its first motion to enforce the settlement.

In its response to this motion, Defendants argued that a settlement agreement can be overturned in the case of "mistake or fraud," and that "Mr. Ericsson evinces a mistake in his reasoning following the settlement facilitation." Doc. 92 at 3. Defendants stated that "[t]he parties had agreed to settle on what were, at the facilitation, a bare list of items. There would be a payment of $10,000, a promise to pay $150,000, a promise to surrender a patent in the event the settlement was breached, a stipulated judgment in the event of a breach, and a requirement that Mr. Ericsson guarantee performance and payment under the terms of the note." *Id.* "In the event Mr. Ericsson dies or becomes incapacitated while payment of $150,000 was ongoing, it was further agreed that the requirement to pay would end or be stayed pending his recovery." *Id.* at 3-4. Defendants pointed out that the settlement documents prepared by Plaintiff did not account for disability or incapacity, as agreed to at the settlement conference, and that Plaintiff's paperwork resurrects the claim for fraud that had previously been dismissed. *Id.* at 4-5.

Mr. Ericsson swore out an affidavit in support of the response. Doc. 92 at 9. He stated: "Following the settlement facilitation, in spite of my attorney's advice and direction, I failed to

remember that I had agreed to a personal guaranty and objected to its inclusion among the settlement documents." *Id.* ¶ 2. "After reviewing facilitation discussions with my sister, Jane Barnes, I accept that I had agreed to a personal guaranty, but that I had agreed only if it took into account that as I am 74 years old, I might die or I might become incapacitated or disabled during the term of the promissory note." *Id.* ¶ 3. He acknowledged he had "also agreed to a bankruptcy waiver, but after speaking with my attorney and another attorney in Florida, I do not believe I could sign such a waiver." *Id.* ¶ 5. He also stated he will not agree to stipulate that Defendants committed fraud. *Id.* Finally, he stated that his recollection was that Judge Robbenhaar stated the terms of the settlement were "not final" until the parties signed all the documents. *Id.* ¶ 6.

In reply, Plaintiff agreed that "waivers" to discharge in bankruptcy "are generally unenforceable." Doc. 94 at 3. "The parties did not agree to a waiver of discharge. The parties agreed to prepare language that protected the stipulated judgment and maintain its enforceability in bankruptcy." *Id.* at 3-4. Plaintiff proposed "language stipulating to facts, which may be given a collateral estoppel effect in a future bankruptcy." *Id.* at 4. In particular, counsel proposed this language:

> "The Parties further stipulate and agree that the payments made under this Agreement, including the Initial Settlement Payment and the Note, as secured by the Stipulated Judgment are as a result of the claims set in the Lawsuit, including without limitation paragraph 14, and shall have a collateral estoppel effect."

*Id.*[3]

Judge Robbenhaar denied the Motion to Enforce without prejudice. Doc. 98. In this order, Judge Robbenhaar explained that, after objecting to the inclusion of the personal guaranty,

---

[3] Paragraph 14 of the complaint states "Defendants further induced Fiore Industries to perform services and provided materials without the intention of actually paying for said services or materials." Doc. 1 at 2 ¶ 14.

"Ericsson now recalls that he did agree to the personal guaranty, but he maintains that he agreed to do so only if it 'took into account' that he might die or become incapacitated or disabled during the term of the promissory note; Ericsson is 74-years-old. The Court's notes are consistent with that understanding." *Id.* at 5 (citation omitted).

Regarding the bankruptcy discharge waiver, Judge Robbenhaar found:

[A]ny waiver of bankruptcy rights is void as against public policy; therefore, it is an unenforceable aspect of any proposed language in the closing documents. 11 U.S.C. § 524(a)(1) and (2) (effects of bankruptcy discharge); *see, e.g., Hayhoe v. Cole* (*In re Cole*), 226 B.R. 647, 651-53 & nn. 6-7 (9th Cir. BAP 1998) (debtor's prepetition waiver of discharge was void as against public policy). *After* filing bankruptcy, a debtor is permitted to waive the discharge of a debt under two circumstances: the debtor may reaffirm the debt under § 524(c); or the debtor can execute a waiver of discharge that is approved by the bankruptcy court under § 727(a)(10). *See id.; In re Madison*, 184 Bankr. L. Rep. 686, 690 (Bankr. E.D. Pa. 1995) (citing *Fallick v. Kehr*, 369 F.2d 899, 904 (2d Cir. 1966)) (an agreement not to file bankruptcy is unenforceable because it violates public policy); *see also Sandia Lab'y Fed. Credit Union v. Torrez* (*In re Torrez*), 415 Bankr. L. Rep. 842, 848 n.2 (Bankr. D.N.M. 2009) ("Prepetition agreements to waive discharge or to forego bankruptcy or its benefits are unenforceable as against public policy.").

Doc. 98 at 9.

Because "Defendants have not filed a petition for bankruptcy," "a prepetition waiver of such rights cannot be included in any closing documents." *Id.* "However, incapacity and disability were negotiated terms associated with the personal guaranty. The Court discussed those issues with the parties, and the Court's notes confirm that the parties agreed to include limiting language regarding Ericsson's potential death, disability *and/or* incapacity in the personal guaranty." *Id.* Judge Robbenhaar stated that "it appears to the Court at this stage that the material terms of the settlement agreement remain intact and enforceable as noted herein," but that further discussions were required to resolve Plaintiff's concerns about getting paid. *Id.* at 9-10. Judge Robbenhaar denied Plaintiff's motion and request for fees and costs. *Id.* at 10. He set a status conference with counsel for both parties for August 5, 2021. *Id.* at 1.

At the status conference, Mr. Thomas stated that Plaintiff has never asked for a waiver of bankruptcy. Doc. 99 at 2 (clerk's minutes). However, Judge Robbenhaar explained that Plaintiff's proposed alternative—stipulated language resurrecting the fraud claim and references to paragraph 14 of the complaint—cannot be a basis of a stipulated judgment because all tort claims, including the fraudulent inducement claim, were dismissed by the Court. *Id.*; *see also* Doc. 33 at 19-20. Regarding the disability/incapacity language, Mr. Bezpalko stated that the language in Judge Robbenhaar's order was acceptable to Defendants. Doc. 99 at 2. Mr. Thomas, for Plaintiff, confirmed that "Mr. Ericsson's legal incapacitation can most likely be agreed upon." *Id.* at 3. Counsel agreed to discuss matters further with their clients and Judge Robbenhaar, and further agreed to participate in caucus calls on August 12th. *Id.*

On August 10, Judge Robbenhaar set a Zoom Settlement Conference Follow-Up for August 24, 2021. Doc. 103. "Forty-eight hours in advance of the hearing, counsel shall exchange closing documents with each other, and serve a copy to the Court through the proposed text email address: robbenhaarproposedtext@nmd.uscourts.gov." *Id.* Also on August 10, Defendants filed a joint motion to continue the trial setting of September 27. Doc. 104. The motion stated: "On May 26, 2021, the parties held a settlement conference at which general terms were reached that would allow the case to be settled." *Id.* ¶ 2. The Court granted the motion and vacated the September trial setting. Doc. 105.

On August 23, Mr. Bezpalko sent an email stating that Mr. Ericsson would not sign settlement documents or give Mr. Bezpalko the authority to speak on his behalf. Doc. 106 at 1 (clerk's minutes). On August 24, at the follow-up settlement conference, Mr. Bezpalko explained that he spoke to his client that day, and that Mr. Ericsson would only agree to a "'best efforts' personal guarantee, not a personal guarantee as stated in the proposed documents." *Id.* at 2. "Mr.

Ericsson is also talking to a new attorney, but it's unclear whether that counsel will take over in this case." *Id.* Finally, Mr. Bezpalko disclosed that "Mr. Ericsson also does not have a patent in his possession, and both his patents have been assigned elsewhere." *Id.*

> In response,
>
> Mr. Thomas explained that the new roadblock today is concerning, and it relates to the patents. The patents were transferred and assigned by Mr. Ericsson 15 days before the May 26th mediation with this Court. Mr. Ericsson participated in the mediation knowing he had transferred those patents before the hearing, and then falsely pledged them as security, falsely representing them as collateral to the Court and parties. That activity is troubling, but fixable because that action can technically be reversed. The option to enforce the settlement agreement, therefore, exists.

*Id.* Judge Robbenhaar clarified that the assigned patents are the same as those offered as collateral at the May 26 settlement conference. *Id.*[4] Mr. Thomas expressed that "Plaintiff agreed to vacate the trial with the understanding that settlement would occur on the agreed upon terms, but facts suggest that was not Defendants' intent." *Id.*

Judge Robbenhaar expressed that he was troubled that "assets were pledged by Defendants here, and that those very assets had been knowingly and otherwise encumbered and assigned prior to the settlement conference." *Id.* at 3. He was inclined to find bad faith and that no further settlement discussions at the August 24 follow-up settlement conference would be productive. *Id.* Mr. Ericsson spoke up, despite the Court's caution not to speak, and stated that to resolve this issue, "Mr. Ericsson needs to have his personal responsibility removed from any agreement." *Id.* Judge Robbenhaar indicated that he was inclined to issue an order to show cause why an order of contempt should not issue and then concluded the conference. *Id.*

---

[4] Because the payment of the settlement was not to occur up-front in full, the parties agreed that "Algastar's promissory note to Plaintiff was secured by a patent [owned by Mr. Ericsson] on the BioStem technology pursuant to terms agreed upon by the parties." Doc. 98 at 3.

Judge Robbenhaar issued the order to show cause on the same day, August 24. Doc. 107.

He ordered Defendants and defense counsel to address:

> (1) Defendants' false representation of assets as collateral during a Rule 16
> settlement conference, which appears to relate only to Mr. Ericsson and Ms.
> Barnes, and (2) Defendants' agreement, along with defense counsel, to enter into
> settlement negotiations and vacate the trial date otherwise set in September 2021,
> in the absence of good faith.

*Id.* at 3. Defendant Ericsson and Mr. Bezpalko filed responses on August 31. Docs. 110 & 111.

Mr. Ericsson submitted an affidavit attached to his response. Doc. 110 at 6. In this affidavit, Mr.

Ericsson explained:

> Once I saw the personal guaranty, I thought that this had meant I was to guarantee
> best efforts of AlgaStar to pay the settlement. I told my attorney that I did not
> understand what the proposed guaranty was. After listening to a tape of my
> comments on May 26, I realized that I had understood it that day and may have to
> accept it.

Doc. 110 at 7 ¶ 6. Regarding Defendants' financial condition, he stated:

> Due to my and AlgaStar's uncertain financial future and the legal advice of
> others, I cannot agree in good faith to pay nor agree to many other stipulations
> which I discovered in the settlement documents on August 23rd, just one day
> before the next final mediation meeting, like the immediate required payment of
> minimum monthly payments of $750 and 5% interest or be in default of the
> settlement and other personal pledges which were never discussed in any of the
> mediation negotiations sessions nor with my attorney.
>
> I cannot pay $750 per month now or predict the payment of $50,000 in two years
> or have any reasonable expectation that new money will be available in the next
> two years or have any certainty that $150,000 would be earned by me or will be
> invested by third parties in AlgaStar, Inc., to pay the settlement.

*Id.* at 8 ¶¶ 11-12.

Also on August 31, Plaintiff filed the present Sealed Motion For Default Judgment Or In

The Alternative To Enforce Settlement And For Sanctions. Doc. 113. Plaintiff stated that it

agreed to continue the trial based on the representation by Defendants that terms had been

reached allowing the case to be settled. *Id.* at 5. Shortly thereafter, on August 22 and 23, Plaintiff

learned that Mr. Ericsson would not sign the settlement documents, and that the patent had been

transferred from Mr. Ericsson to his sister, Jane Barnes, and to Georgine Burt Eric. *Id.* Plaintiff

also pointed out that "[a]t the August 24th settlement conference, Mr. Ericsson also changed his

position on the personal guaranty yet again." *Id.* at 6.

The motion requested default judgment based on Mr. Ericsson's "dishonesty with the

Court" in three ways: (1) making false representations and contradictory statements about

agreeing to a personal guaranty; (2) fraudulently inducing Plaintiff to agree to vacate the trial

setting in this matter under the guise that the parties were simply ironing out the final details of a

settlement; and (3) fraudulently transferring intellectual property prior to the settlement

conference, then representing that that intellectual property could be used as collateral for the

settlement. *Id.* at 7-8. Alternatively, the motion requested that the Court enforce the settlement as

agreed by the parties, order that the patent serving as collateral be transferred back to Mr.

Ericsson, and order that the patent shall remain in Mr. Ericsson's name until such time that the

full settlement amount is paid. *Id.* at 12. Plaintiff argued:

> The question of what bankruptcy language was resolved by the fact that Fiore
> agreed to use the language proposed by Mr. Ericsson. That detail is or should be
> resolved. All counsel further agreed that the proper definition for incapacity to
> relieve a party of obligations under a guaranty should be legal capacity
> determined by a court of competent jurisdiction. That detail is or should also be
> resolved. Even if those two disagreements persisted, there remain material terms
> agreed to by the parties at the May 26, 2021 mediation, and an enforceable
> settlement agreement.

*Id.* at 13. The bankruptcy language to which Plaintiff referred in the preceding paragraph was as

follows:

> It is understood and agreed that there would be no legitimate reason for Algastar
> or Ericsson to file for bankruptcy protection unless AlgaStar and Ericsson show
> they have acted in good faith but failed due to circumstances outside its control.
> The Parties further stipulate and agree that a claim of fraud may be brought
> against Ericsson or AlgaStar if either files for bankruptcy without good cause.

Doc. 137-1, Plaintiff's Exhibit A to Nov. 3, 2021 Evidentiary Hearing; Doc. 136 at 32:5-12, 33:14-17; Doc. 92 at 21 (7/6/2021 email from Mr. Bezpalko agreeing that "My client will accept a warning that, in addition to losing the patent, AlgaStar and Ericsson may face a claim of fraud if they file for bankruptcy shortly after signing this agreement.").

On September 3, Judge Robbenhaar imposed sanctions against Defendants Ericsson and AlgaStar. Doc. 114. With respect to the transfer of the patents, Judge Robbenhaar found that Mr. Ericsson's "behavior is either fraudulent and intentional bad faith, or tantamount to bad faith, and thus warrants sanctions under any scenario." *Id.* at 7. With respect to the personal guarantee, Judge Robbenhaar found that

> Mr. Ericsson's explanation for backing away from the settlement agreement strains credulity. Material settlement terms in this case were clear and unequivocal; although small details and precise written language still needed to be agreed upon, the general terms were not and are not disputed. And yet it is now clear that Mr. Ericsson never intended to honor those material terms. What might generously be described as buyer's remorse is instead Mr. Ericsson's brash attempt to renege on an arm's length agreement; either way, the conduct is based on a lack of candor and failure to deal honestly with the Court and counsel.

*Id.* at 8. Judge Robbenhaar found that "an award of attorney's fees and costs to Plaintiff against Defendants satisfies each purpose for awarding sanctions." *Id.* at 10. And in conclusion, Judge Robbenhaar clarified:

> This order for sanctions is limited to Mr. Ericsson and AlgaStar's (1) fraudulent representations on May 26, 2021 concerning the offer of secretly transferred patents, which he did not lawfully possess, as collateral to the promissory note and personal guaranty, and (2) agreement to vacate the trial date in order to finalize written settlement language, while outrightly reneging the personal guaranty before this Court on August 24, 2021.

*Id.* at 11. After hearing from both parties with respect to the amount of attorney's fees, Judge Robbenhaar imposed $5,849.50 as a sanction on October 26. Doc. 126.

On September 17, Defendants filed their response to the Motion for Default Judgment or to Enforce Settlement. Doc. 118. Defendants argued that default judgment was not warranted and

acknowledged that "the question of a personal guaranty was in fact quickly resolved after Defendant Ericsson acknowledged both his own forgetfulness and clear misunderstanding." *Id.* at 5. Defendants also asserted that the assignment of the patents was easily reversible, and agreed that the patent as collateral was material to the settlement. *Id.*

Defendants acknowledged that "while Defendant Ericsson did agree on the record to settle the case, it is also true that such a settlement can be set aside by the Court under Fed. R. Civ. Pro. 60(b)(6)." *Id.* at 6. Defendants asserted conclusorily, without any concrete arguments, that justice would be "better served" by setting aside the settlement. *Id.* at 6-7.

Finally, Defendants argued that the settlement documents Plaintiff prepared did not accurately reflect the parties' agreement. Defendants observed that the settlement documents did not reflect an exception for disability; that Plaintiff's Promissory Note included interest, installments, and late fees even though these were not negotiated terms; that Plaintiff's proposed stipulated judgment resurrected the dismissed fraud claim; and that Plaintiff's proposed Personal Guaranty waived Defendants' notice rights and provided for interest charges. *Id.* at 7-8. Plaintiff filed its reply on September 30. Doc. 122.

The Court held an evidentiary hearing on November 3, 2021. Doc. 132 (clerk's minutes). Plaintiff argued there was an enforceable settlement because it agreed to use Defendants' proposed bankruptcy language, agreed to an exception for legal incapacity (with the question of incapacity being decided by a court of competent jurisdiction), and agreed to accept an exception for disability as determined by a court. Doc. 136 at 23-25. Regarding the need for a provision providing for interest payments on the promissory note, Plaintiff argued that, without an agreement to pay interest, the IRS treats a promissory note as a gift. Plaintiff acknowledged,

however, that the parties did not discuss interest payments on the promissory note as part of the settlement agreement they reached on May 26. *Id.* at 25-26.

Plaintiff called Ms. Christine Zack, president and in-house counsel of Fiore, as its witness. *Id.* at 28. She testified that, in her opinion, the parties reached a mutual settlement agreement on May 26. *Id.* at 29. She approved, on behalf of Plaintiff, the bankruptcy language Mr. Ericsson requested. *Id.* at 31-32. Plaintiff also agreed to include legal incapacity as a reason, along with death, to relieve Mr. Ericsson of duties under his personal guarantee. *Id.* at 32. She testified that Exhibit B (filed under seal) reflects the parties' finalized agreement with respect to these issues. *Id.* at 34-35. In her opinion, the parties reached a settlement agreement that included a personal guarantee by Mr. Ericsson. *Id.* at 38. From Plaintiff's perspective, both the personal guarantee and the patent as collateral were material provisions of the settlement agreement. *Id.* at 37-39. Plaintiff did not intend the promissory note to be a gift, but Plaintiff would accept whatever interest rate the Court deems reasonable. *Id.* at 43-44. On cross, Ms. Zack admitted she was unfamiliar with whether the IRS would deem a promissory note without interest as a gift even in a situation where consideration was given for the note. *Id.* at 46-47.

In his opening argument, Mr. Bezpalko conceded that the parties reached an agreement on the record with Judge Robbenhaar, but that the terms were not finalized until the paperwork was finalized. *Id.* at 50. Mr. Bezpalko agreed that the parties reached an understanding on the exception for legal incapacity. *Id.* at 51-52. He stated that the parties accepted there would be no bankruptcy waiver in the agreement. *Id.* at 53. He advised that "Mr. Ericsson has prepared a new transfer document to transfer the patent back to his control so that it would be available in the event that this Court orders the matter back to mediation or settlement facilitation" and that "Mr. Ericsson understands that he has an agreement." *Id.* at 55-56.

Defendants called Mr. Ericsson as a witness. *Id.* at 60. Mr. Ericsson testified he no longer wanted to sign a personal guarantee because of a change in circumstances. *Id.* at 61. His company was unable to raise capital, lost money due to the pandemic, and lost a lawsuit on August 14. *Id.* at 61-62. He testified his only income is from social security. *Id.* at 62. He received legal advice not to guarantee his company's debt, given that he does not have the financial means to meet such an obligation. *Id.* at 63. He testified that Algastar has no assets and no cash. *Id.* at 68. He testified the patent in question was reassigned back to him. *Id.* at 71. On cross-examination, he testified that he agreed to a personal guarantee on May 26 but did not understand what that meant. *Id.* at 75. He also testified that the parties agreed to the monetary amount of the settlement, an initial payment, a promissory note, and a stipulated judgment. *Id.* at 74-76. He also testified that he "may have" agreed to pledge a patent as security for the agreement "in concept" but again he did not understand the reality of it. *Id.* at 78-79. He reiterated that he does not want to go forward with the settlement on May 26 to include a personal guarantee. *Id.* at 88.

During closing arguments, the Court instructed Mr. Bezpalko to email Mr. Thomas a copy of the signed documents regarding the patent transfer back to Mr. Ericsson's name. *Id.* at 120-21. Mr. Bezpalko agreed to do so. *Id.* at 121.

## DISCUSSION

I.    **The Parties Entered Into An Enforceable Settlement Agreement As To All Material Terms On May 26.**

The trial court has "the power to summarily enforce a settlement agreement entered into by the litigants while the litigation is pending before it." *United States v. Hardage*, 982 F.2d 1491, 1496 (10th Cir. 1993). "[W]here material facts concerning the existence or terms of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing." *Id*. The

14

Court held an evidentiary hearing and finds the material terms of the contract are as set forth in this Memorandum.

Issues involving the enforceability of a settlement agreement are resolved by applying state contract law. *United States v. McCall*, 235 F.3d 1211, 1215 (10th Cir. 2000); *Shoels v. Klebold*, 375 F.3d 1054, 1060 (10th Cir. 2004). New Mexico encourages settlements. *McConal Aviation, Inc. v. Commercial Aviation Ins. Co.*, 1990-NMSC-093, ¶ 20, 799 P.2d 133, 136. The elements required to establish a binding contract under New Mexico law are: (1) offer, (2) acceptance, (3) consideration, and (4) mutual assent by the parties to the material terms of the contract. *Garcia v. Middle Rio Grande Conservancy Dist.*, 1996-NMSC-029, ¶ 9, 918 P.2d 7, 10. The parties do not dispute that elements 1 through 3 are satisfied here.

Defendants do argue, however, that the agreement on May 26 was not final because there was no mutual assent to all the material terms and the parties had 30 days to finalize the settlement. The Court rejects this argument because it is clear that the parties *did* agree to all the material terms of the settlement on May 26. After May 26, the parties disagreed over precisely how they should express the terms of their agreement and about proposed modifications to the May 26 contract. But this does not mean there was no contract on May 26.

The New Mexico Court of Appeals has made clear that the details of an agreement need not be finalized and reduced to writing for an enforceable settlement agreement to exist:

> Plaintiff asserts he had a right to withdraw from the settlement because it had not been completed by the signing of settlement papers and the acceptance of money at the time plaintiff's motion was filed. He cites law to the effect that where the parties contemplate that the compromise agreement will not be binding until committed to writing and signed, either party may repudiate the agreement before the written agreement is signed. He contends this rule is applicable in this case. We disagree.

> The record of the 'settlement proceedings' before the trial court shows a settlement had been reached, shows the details of the settlement and the trial court's approval of that settlement. The record shows the parties contemplated

putting the terms of the settlement in a written agreement to be signed by the parties, but there is nothing showing the settlement was not to be effective until this was done. An oral stipulation for the compromise and settlement of claims growing out of personal injuries made in open court in the presence of the parties and preserved in the record of the court is as binding as a written agreement. Plaintiff's claim that the settlement was not effective until placed in writing and signed is without merit.

*Esquibel v. Brown Const. Co.*, 1973-NMCA-111, ¶¶ 20-21, 85 N.M. 487, 490 (citations omitted); *see also Evans-Carmichael v. United States*, 250 F. App'x 256, 262 (10th Cir. 2007) (enforcing settlement in similar circumstances); *Doi v. Halekulani Corp.*, 276 F.3d 1131, 1141 (9th Cir. 2002) ("[W]e cannot countenance a plaintiff's agreeing to settle a case in open court, then subsequently disavowing the settlement when it suits her. The courts spend enough time on the merits of litigation; we need not (and therefore ought not) open the flood gates to this kind of needless satellite litigation.").[5] The Court finds that there was no misunderstanding on May 26, and that both parties expressed mutual assent to the material terms of the settlement agreement.

The Court similarly rejects Defendants' briefly-raised argument that the settlement should be modified under Rule 60(b). The Tenth Circuit has explained Rule 60(b) is not a means to alter or amend a settlement agreement reached in federal court. "[T]he 'mistake' provision in Rule 60(b)(1) provides for the reconsideration of judgments only where: (1) a party has made an excusable litigation mistake or an attorney in the litigation has acted without authority from a party, or (2) where the judge has made a substantive mistake of law or fact in the final judgment or order." *Cashner v. Freedom Stores, Inc*., 98 F.3d 572, 576 (10th Cir. 1996). "Rule 60(b) does

---

[5] In a footnote in one brief, Defendants cite the New Mexico Mediation Procedures Act, and argue that the Act requires a settlement to be reduced to a written record and signed by both parties. Doc. 92 at 6 n.4 (citing N.M. Stat. Ann. § 44-7B-6 ("If the mediation parties reach a settlement agreement evidenced by a record signed by the mediation parties, the agreement is enforceable in the same manner as any other written contract.")). Even assuming this state procedural law applies in federal court, the Act is not exclusionary. It states what *is* enforceable under the Act, rather than defining what is not enforceable as an oral contract.

not provide relief for mistakes made in the negotiation of a contract or a stipulation (which is treated like a contract)." *Id.* at 578; *see also id.* at 580 ("We find nothing sufficiently 'unusual or compelling' about making a bad bargain to warrant relief under Rule 60(b)(6).").

At the evidentiary hearing, Mr. Ericsson testified that he regrets entering into the settlement because he and his company do not have the money to pay the settlement. Mr. Ericsson was counting on certain things to happen (such as prevailing in a lawsuit again British Petroleum) in order to fund the company, but these things did not happen. Additionally, he has no expectation that these things will ever happen or that his company will ever be funded. That the future did not unfold as, on May 26, Mr. Ericsson expected it would provides no permissible reason for Mr. Ericsson to back out of his May 26 agreement. *See Cashner v. Freedom Stores, Inc.*, 98 F.3d 572, 580 (10th Cir. 1996) ("Defendants have alleged only a unilateral mistake . . . that led to their entering into an improvident bargain. Stipulated judgments negotiated in open courts are not to be easily set aside. Such judgments are as final as those entered following trial." (internal quotation marks omitted)).

Notably, Mr. Ericsson never testified he did not agree to settle the case on May 26. He knows he agreed to settle the case on May 26. But his circumstances allegedly changed, and he attempted to renegotiate the terms of the settlement, or withdraw from it. This is not an argument of mistake or fraud sufficient to rescind a contract. Instead, it supports a finding that Mr. Ericsson has buyer's remorse, which does not constitute a basis to rescind a settlement agreement. *See, e.g.*, *Newkirk v. Vill. of Steger*, 536 F.3d 771, 775 (7th Cir. 2008).

The Court also recognizes that, after May 26, the parties engaged in extensive negotiations related to the possible modification of the May 26 settlement agreement. The parties never reached a meeting of the minds as to proposed modifications, however. The Court

therefore disregards evidence of negotiations that occurred after May 26 and instead focuses on the material terms of the enforceable agreement reached on May 26.

The best evidence of the material terms of the agreement is Judge Robbenhaar's order summarizing those terms. Relying on Judge Robbenhaar's understanding of the settlement agreement is permissible because it is not extrajudicial knowledge—it is knowledge gained via the judicial proceedings themselves. *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 447-48 (2d Cir. 2005). Such reliance does not require the judge to recuse or turn the judge into a witness. *Id.*; *Lopez v. XTEL Const. Grp., LLC*, 796 F. Supp. 2d 693, 698 (D. Md. 2011). In addition, the Court finds that no evidence the parties presented at the evidentiary hearing contradicts Judge Robbenhaar's account of the material terms.

Considering Judge Robbenhaar's order as well as all the evidence recited above, the Court finds the parties entered into an enforceable agreement with the following terms[6]:

- Defendant Algastar, Inc. shall pay $10,000 to Fiore upon the execution of the settlement agreement.

- Algastar shall execute a $150,000 promissory note to Fiore, with a balloon payment due two years after the execution of the Note. However, if Algastar makes $50,000 in payments on the Note during the initial two years, it shall receive an additional two-year extension on the Note's maturity.

- The promissory note shall not provide for any interest.

- The Note would be secured by a patent on the BioStem technology as set forth in a security agreement. John Ericsson shall not transfer ownership of, or otherwise alienate, assign, or bequeath, this patent for the duration of the Note unless it is to Plaintiff in the event of a breach.

---

[6] The settlement agreement the parties reached also includes one unenforceable term: The prepetition waiver of discharge in bankruptcy. Plaintiff, however, can waive enforcement of that term and sever it from the contract because the term was in its favor. The Court's understanding is that Plaintiff has waived enforcement of the bankruptcy provision. If this is incorrect, Plaintiff should so inform Judge Robbenhaar.

- Mr. Ericsson shall execute a personal guaranty of the Note.

- Defendants did not agree to waive any notice rights.

- The Note shall provide for an exception on Mr. Ericsson's death, incapacity, or inability to work, i.e., it shall stipulate that Mr. Ericsson's death and any disability or incapacity that could prevent him from working, as determined at law, would void the personal guaranty.

- The settlement will be reduced to a stipulated judgment for breach of the settlement agreement, to be held in escrow pending any breach of the agreement and to be filed in the event of a breach by Defendants. Plaintiff Fiore shall make any necessary payments associated with the escrow account.

- The stipulated judgment shall not resurrect Plaintiff's dismissed tort claims. It shall not stipulate that Defendants are liable on the original complaint in this lawsuit nor that fraud was committed, only that Defendants are liable for breach of the settlement agreement.

- The parties shall execute a Settlement Agreement and Release. The Settlement Agreement shall include a confidentiality provision, a non-disparagement agreement, a release of all claims by all parties against all other parties, and no admission of liability by any party.

## II.    The Court Denies Plaintiff's Request for Default Judgment.

"[C]ourts have broad inherent power to sanction misconduct and abuse of the judicial process, which includes the power to enter a default judgment. Default judgment is a harsh sanction that should be used only if the failure to comply with court orders is the result of willfulness, bad faith, or any fault of the disobedient party rather than inability to comply." *Klein v. Harper*, 777 F.3d 1144, 1147-48 (10th Cir. 2015) (citations and internal quotation marks omitted). Before choosing default as a sanction, a court must consider: "(1) the degree of actual prejudice to the [opposing party]; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that [default judgment] would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions." *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992) (citations and internal quotation marks omitted).

Before addressing the *Ehrenhaus* factors, the Court observes that settlement of the case on May 26 precludes default judgment as a remedy. This is because a condition of the May 26 settlement is that Plaintiff must compromise its claims. If that agreement is enforceable, Plaintiff has no live claims on which a default judgment can be entered. Even if the May 26 settlement agreement were not enforceable, however, the Court would not enter default judgment as the *Ehrenhaus* factors countenance against such a result.

First, Plaintiff argues that Defendants' wrongful conduct caused it to agree to continue the trial date and the ensuing trial continuance caused it prejudice. To the extent Defendants' conduct caused a continuance in the trial date, this continuance has only minimally, if at all, impaired Plaintiff's ability to prosecute its case. Plaintiff does not support its allegation of prejudice with reference to lost evidence or any other adverse effect the continuance has had on Plaintiff's case. Although inexcusable, Defendants' sanctionable conduct affected the potential settlement of this case, not the likelihood that this case would be decided fairly on its merits. The Court does agree that Defendants' actions, which Judge Robbenhaar found to be in bad faith, needlessly caused Plaintiff's attorneys to spend substantial resources litigating issues created by Defendants' wrongful conduct. As discussed below, however, the Court has already addressed this by ordering Defendants to pay attorney fees Plaintiff incurred in connection with litigation that Defendants' wrongful conduct made necessary. Because Defendants' sanctionable conduct did not prejudice Plaintiff's ability to prosecute its case, this factor strongly weighs against a default judgment.

The minimal impact Defendants' conduct had on presentation of the merits of this case also relates to the second factor, which is the extent to which Defendants' conduct affected the judicial process. The judicial process affected (settlement discussions) was not a process

designed to determine the truth of Plaintiff's allegations and did not affect the discovery or presentation of evidence. Therefore, this is a factor that weighs against default judgment. The degree to which this factor weighs against default judgment, however, is reduced by the interference with the judicial process that did occur. Defendants' wrongful conduct delayed trial in a case that is three years old. Further, Judge Robbenhaar spent a great deal of time preparing for settlement conferences and mediating the parties' disputes, only to discover that Mr. Ericsson made false or misleading statements and promises during settlement discussions. Dismissal (or default judgment), however, is a sanction reserved for "extreme" cases. *See Ehrenhaus*, 965 F.2d at 921.

Third, the Court agrees with Judge Robbenhaar's well-reasoned findings about Defendants' culpability. Doc. 114 (Order For Sanctions Against Defendants). In offering as collateral an asset Mr. Ericsson knew he had just transferred to someone else, Mr. Ericsson, at a minimum, demonstrated a "lack of candor and failure to deal honestly with the Court and counsel." *Id.* at 8. Such behavior cannot be tolerated, regardless of which aspect of the judicial process it impairs. Defendants' conduct was culpable, not merely negligent, and this culpability factor strongly weighs in favor of default judgment.

Fourth, the Court did not warn Mr. Ericsson in advance that the result of his conduct could be a default judgment. At the evidentiary hearing, Plaintiff argued that Judge Robbenhaar warned Mr. Ericsson on August 24 that Mr. Ericsson's behavior was in bad faith. It is true that Judge Robbenhaar stated he was issuing an order to show cause and that Plaintiff could file a motion for further sanctions based on this behavior. And after that, on August 31, Mr. Ericsson made further statements in his Response to the Order to Show Cause that, according to Plaintiff, showed a disregard for the integrity of the judicial process. As to Plaintiff's first point, Judge

Robbenhaar's August 24 statements did not amount to a warning that the case might be dismissed. As to Plaintiff's second point, Plaintiff does not premise its motion for default judgment on Mr. Ericsson's August 31 statements. Instead, Plaintiff's motion for default judgment is based primarily on conduct occurring on or before August 24 (making contradictory statements about agreeing to a personal guaranty; inducing Plaintiff to agree to vacate the trial setting; and transferring intellectual property prior to the May 26 settlement conference). Therefore, the warning factor weighs against a default judgment.

Fifth, the Court finds that lesser sanctions are appropriate. To some extent, Judge Robbenhaar has already issued those sanctions. Docs. 114 & 126. Judge Robbenhaar has already described the most problematic aspects of Mr. Ericsson's conduct related to settlement negotiations that wasted his and Plaintiff's time. The Court adopts Judge Robbenhaar's analysis; to require Plaintiff to pay costs associated with its motion to enforce the settlement agreement would be unfair, given that it was the bad faith conduct of Defendants, not Plaintiff, that necessitated the motion.[7] Judge Robbenhaar's fee award does not consider costs Plaintiff incurred after September 9, 2021. Doc. 115 at 12; Doc. 126 at 4. Thus, in addition to sanctions Judge Robbenhaar has already imposed, the Court hereby orders Defendants to pay for attorney's fees Plaintiff incurred after September 9, 2021 related to the motion to enforce the settlement agreement.

Plaintiff argues that monetary sanctions are ineffective because Defendants are refusing to pay them. Defendants asserted at the evidentiary hearing that Algastar has no income and that Mr. Ericsson is unemployed and living off of his monthly social security benefits. Doc. 136 at

---

[7] Based on these findings, and consistent with Judge Robbenhaar's order, the Court enters sanctions against Defendants, not their counsel.

62. More recently, Plaintiff filed a notice with the Court that Defendants did not pay the sanctions in full. Doc. 139. Plaintiff stated that "on November 4, 2021, Defendant submitted a payment of $3,000.00 leaving a remaining balance of $2,849.50 due on December 2, 2021." *Id.* at 1. "On December 3, 2021, counsel for Defendants, Ian Bezpalko, delivered the email attached hereto as Exhibit A, stating that Mr. Ericsson has been unable to obtain the funds to pay the second half of the attorney fees." *Id.* The email states:

> Mr. Ericsson informs me that he has been unable to obtain the funds to pay the second half of the attorney fees. You heard his testimony during the hearing -- he does not have the money, is unemployed, and has no expectation of earning anything for the foreseeable future. Mr. Ericsson states that he will "confess judgment for the balance of the fine" but cannot do anything more.

*Id.* at 3.

The Tenth Circuit has held, in the context of sanctions under Rule 11, that a district must consider "[t]he offender's ability to pay . . ., not because it affects the egregiousness of the violation, but because the purpose of monetary sanctions is to deter attorney and litigant misconduct." *White v. Gen. Motors Corp.*, 908 F.2d 675, 685 (10th Cir. 1990). Of course, "a bald assertion that [the offenders] are on the verge of financial collapse is plainly insufficient to establish an inability to pay." *Dodd Ins. Servs., Inc. v. Royal Ins. Co. of Am.*, 935 F.2d 1152, 1160 (10th Cir. 1991). Even a sworn affidavit with this assertion is insufficient. *Id.* To avoid full payment of this sanction, Defendants must "come forward with evidence of their financial status," *White*, 908 F.2d at 685, which Defendants have not done in this case.

When a court does not excuse the balance of sanctions against a party due to a demonstrated inability to pay, the court may reduce the unpaid balance to a final judgment. *See Moore v. Harris*, 600 F. App'x 201, 205 (5th Cir. 2015) (finding it within a district court's discretion to reduce sanctions to a judgment). Because Defendants represented they are unable to pay the Court's sanctions without providing evidence to support this assertion, the Court will

provide Defendants an opportunity to provide evidence of their inability to pay. Defendants may present evidence of their inability to pay sanctions to the Court by filing under seal financial documentation that supports their assertion. Such documentation shall be filed no later than 30 days from the date of this Order. If the Court does not receive any supporting evidence, it will reduce the unpaid balance of sanctions it has imposed, and may yet impose, to a final judgment. If Plaintiff seeks reimbursement for reasonable attorney's fees and costs incurred litigating the enforceability of the settlement after September 9, 2021, it shall file an affidavit substantiating such costs no later than December 30, 2021. Defendants may file objections no later than January 13, 2022.

Taking into consideration the Court's order enforcing the settlement agreement, the Court considers an award of attorney's fees to be an appropriate sanction for Defendants' conduct. The Court notes that, as part of the parties' settlement agreement, Defendants must pay Plaintiff the money they agreed to pay as part of the May 26 settlement agreement. If Defendants do not, Plaintiff will be able to obtain a judgment from the Court. Thus, when it comes to collecting the money Defendants owe it, receiving a default judgment against Defendants does not vastly improve Plaintiff's position.

More importantly, although Defendants' conduct during settlement negotiations does warrant sanctions, the Court is reluctant to enter an order that foregoes presentation of evidence and imposes liability on Defendants based on conduct that does not relate to the merits of Plaintiff's allegations. A party has no obligation to settle a case and so conduct related to settlement discussions that does not affect presentation of the merits of a case has less force as the basis for a default judgment. As a result, balancing all of the *Ehrenhaus* factors, the Court concludes that lesser sanctions than default judgment are appropriate and denies Plaintiff's

24

motion for default judgment. Instead, the Court issues further sanctions in the form of attorney's fees incurred after September 9, 2021.

## III.    Order to Submit Closing Documents

In light of this ruling, the parties are ordered to confer on the requisite settlement documents. If the parties can agree, they shall submit signed, final versions of the documents to Judge Robbenhaar and a stipulated order of dismissal, retaining jurisdiction over the settlement agreement,[8] to Judge Yarbrough within 30 days of the date of this Order. If the parties confer and still cannot agree, counsel shall submit competing, proposed language to Judge Robbenhaar within 30 days of the date of this Order, for his determination as to which version properly reflects the material terms of the settlement entered into on May 26, 2021.[9] If Defendants refuse to submit or sign any paperwork to effectuate the settlement, the Court will incorporate the appropriate terms of the settlement into a judgment with joint and several liability against both Defendants.

SO ORDERED.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent

---

[8] *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994) (if the district court is to retain jurisdiction over the settlement, for the purposes of later entering a stipulated judgment concerning breach of the settlement agreement, then "the parties' obligation to comply with the terms of the settlement agreement [must be] made part of the order of dismissal—either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order").

[9] The Court will not vacate the bench trial date until Plaintiff confirms it is willing to waive the bankruptcy provision or the parties agree to alternative language.